**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  03 CR  64-1 |
| | ) | |
| JON F. WOODALL | ) | JUDGE JOHN W. DARRAH |

### PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, JON F. WOODALL, and his attorney, ALAN R. BRUNELL, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(e)(1)(C), as more fully set forth in Paragraph 13, below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 03 CR 64-1.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Plea Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Plea Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, JON F. WOODALL, and his attorney, ALAN R. BRUNELL, have agreed upon the following:

1

1. Defendant acknowledges that he has been charged in Count One of the superseding information in this case with conspiracy to distribute and possess with intent to distribute 5 or more kilograms of cocaine, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

2. Defendant has read the charge against him in the Count One of the superseding information, and this charge has been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crime with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to Count One of the superseding information in this case.

5. Defendant will plead guilty because he is in fact guilty of the charge contained Count One of the superseding information. In pleading guilty, defendant admits the following facts[1] and that those facts establish his guilt beyond a reasonable doubt of conspiring to possess and distribute cocaine, in violation of Title 21, United States Code, Section 846:

JON F. WOODALL was employed by the Chicago Police Department as a Detective assigned to Area 5. Peter L. Matich and James B. Benson were employed by the Chicago Police Department as Police Officers and were assigned to a tactical unit in the 25th District. Joseph J. Miedzianowski was employed by the Chicago Police Department as a Gang Crimes Specialist.

---

[1] The following statement of facts is merely a summary, which is meant to provide a factual basis that will allow the Court to evaluate whether it should accept defendant's guilty plea. This statement is not a full recitation of all relevant facts known by defendant regarding the incidents described below.

On approximately March 2 , 1998, Detective WOODALL informed Officer Benson that Fred Rock, whom Detective WOODALL had met through Miedzianowski had provided information concerning Person A's involvement in drug trafficking. Detective WOODALL and Officer Benson conducted surveillance of Person A and Person A's residence on the 3500 block of South Western Avenue in Chicago. Subsequently, Detective WOODALL, Officers Matich and Benson and other tactical officers set up a surveillance near Rock's residence on North Keeler Avenue in Chicago, Illinois.

On the evening of March 4, 1998, Detective WOODALL, Officers Matich, Benson, Placencio, Oliveras and Officer 3 (all of which, except Detective WOODALL, were members of the same 25th District tactical team), set up a multi-vehicle moving surveillance near Rock's residence. The officers planned was to arrest Person A, who was expected to be transporting at least one kilogram of cocaine, before Person A reached Rock's residence. However, Person A was riding in a different vehicle than the one the officers had expected, and Person A reached Rock's residence and went inside. Detective WOODALL was closest to Rock's residence and was also in telephone communication with Rock. Detective WOODALL informed the other officers over the radio that Person A had reached Rock's residence and later that Person A had left Rock's residence and was driving away. Subsequently, Detective WOODALL, Officers Matich, Benson, Placencio, Oliveras and Officer 3 in their police vehicles simultaneously converged upon and stopped the Chevrolet Camaro in which Person A and Person B were riding in the middle of Foster Avenue near the Cicero Avenue intersection.[2]

---

[2]Detective WOODALL, Officers Benson, Matich, Placencio, Oliveras and Officer 3 each carried firearms at the time of this arrest and throughout the events set forth below.

The officers with guns drawn, removed Person A and Person B from the Camaro and placed them under arrest. Detective WOODALL searched the Camaro and found a bag containing 3 silver square-shaped packages behind the passenger seat in which Person A had been sitting. Detective WOODALL, believing that these 3 packages were kilograms of cocaine, informed the other arresting officers that he had found drugs in the Camaro. The other officers, who were still surrounding the Camaro after arresting Persons A and B, briefly looked into the bag containing the 3 packages.

Detective WOODALL, Officers Matich, Benson, Placencio, Oliveras and Officer 3 moved their police vehicles, the Camaro and Persons A and B out of the middle of Foster Avenue to a nearby parking lot. Detective WOODALL, Officers Matich, Benson, Placencio, Oliveras and Officer 3 inspected the square-shaped packages which were wrapped in silver tape, and which appeared to all to be kilograms of cocaine. The officers decided to return to the 25th District Police Station.

Detective WOODALL, Officers Benson, Matich, Placencio, Oliveras and Officer 3 took Persons A and B, the Camaro and the 3 suspected kilograms of cocaine to the 25th District Police Station. Person A and Person B were placed in interrogation rooms. The 3 suspected kilograms of cocaine were placed on the table in the tactical team's office in view of all of the members of the tactical team.

Person A agreed to provide information concerning the location of narcotics and unsuccessfully attempted to arrange a drug transaction at the arresting officers' direction. Detective WOODALL, Officers Matich, Benson and Placencio took Person A to Person A's residence on South Western Avenue, Chicago. Detective WOODALL, Officers Matich, Benson and Placencio searched Person A's residence, but found no drugs.

Person A told Detective WOODALL, Officers Benson, Matich and Placencio that there was a vehicle in a police impound lot which contained drugs in a hidden compartment. Detective WOODALL, Officers Matich, Benson and Placencio took Person A to the nearby residence of Person C, who had information about the vehicle containing the drugs. On the instructions of the arresting officers, who waited outside of Person C's residence, Person A obtained from Person C information necessary to identify the vehicle, a two-door, and to determine the address of the police impound lot in which the two-door was located.

Detective WOODALL, Officers Matich, Benson and Placencio decided to go to the police impound lot to determine whether drugs were concealed in the two-door. Officers Matich and Benson rode in one police vehicle and Detective WOODALL, Officer Placencio and Person A rode in another police vehicle to the police impound lot near 83rd Street on the South side of Chicago.

Upon arriving at the police impound lot, Officer Placencio kept Person A in custody in a police vehicle outside of the police impound lot. Detective WOODALL and Officers Matich and Benson drove the other police vehicle into the impound lot and used their position and authority as Chicago Police Officers to gain entry to the police impound lot and locate the two-door. Detective WOODALL and Officers Matich and Benson searched the two-door. Using tools from a bag he had brought into the impound lot, Detective WOODALL pried opened the hidden-compartment inside the two-door. Detective WOODALL removed 6 kilograms of cocaine, a partial kilogram of cocaine (approximately 4 ounces) and a 9 millimeter semi-automatic pistol from the hidden-compartment. Detective WOODALL put the cocaine and the 9 millimeter semi-automatic pistol in the same bag containing the tools that Detective WOODALL had used to pry open the hidden-compartment.

Detective WOODALL and Officers Matich and Benson returned to their police vehicle and drove back to the second police vehicle outside of the police impound lot in which Officer Placencio and Person A were waiting. Detective WOODALL and Officers Matich and Benson got out of their police vehicle. Officer Placencio got out of the police vehicle in which he was waiting and walked over to where Detective WOODALL and Officers Matich and Benson were standing. Detective WOODALL opened the bag and displayed the kilograms of cocaine and the 9 millimeter semi-automatic pistol to Officers Matich, Benson and Placencio. The 6 kilograms of cocaine were packaged in a different color than were the 3 kilograms recovered from the Camaro and, unlike the 3 kilograms recovered from the Camaro, had a design printed on their packaging. Detective WOODALL told the other officers that he intended to release Person A from custody without being charged.

In the parking lot of the 25th District Police Station, Detective WOODALL and Officers Matich and Benson agreed that 2 kilograms of cocaine that they had taken from the two-door in the police impound lot would be inventoried with the Chicago Police Department, that the police reports would falsely represent that these 2 kilograms of cocaine were recovered from the Camaro being driven by Person B, and that Person B would be charged with possession of these 2 kilograms of cocaine, as well as with possession of the 3 kilograms of suspected cocaine recovered from the Camaro. Detective WOODALL told Officers Benson and Matich that he, WOODALL, was taking 1 of the remaining kilograms of cocaine to give to Rock. Detective WOODALL and Officers Benson and Matich then agreed that they would keep for themselves the remaining cocaine from the impound lot. Detective WOODALL kept possession of the remaining 4 kilograms of cocaine and

6

the partial kilogram that they had decided to keep for themselves, as well as the 9 millimeter semi-automatic pistol.

Detective WOODALL, Officers Matich and Benson then went into the 25th District Police Station with 2 kilograms of cocaine from the two-door in the police impound lot. The police officers involved in Person B's arrest either expressly agreed or did not object to having the police reports falsely state that 5 kilograms of cocaine had been taken from the Camaro at the time of Person B's arrest, as well as falsely state other facts concerning Person B's arrest. Consequently, the police reports of Person B's arrest contained numerous false statements, including that the arrest took place in a Jewel parking lot 8 blocks from the location of the actual arrest, that Person A was in an Oldsmobile and Person B was in the Camaro shortly before their arrest, that Persons A and B were observed in the Jewel parking lot outside of the Camaro, and that Person B was observed removing packages which appeared to be kilograms of cocaine from the trunk of the Camaro. These police reports disclosed neither the visit to the police impound lot, nor the search of the two-door in the police impound lot.

Subsequently, Officer Matich contacted an associate to find a buyer for kilograms of cocaine. Detective WOODALL gave Officer Benson a kilogram of cocaine to give to Officer Matich. Officer Matich gave this kilogram of cocaine to his associate, who then found someone who was interested in buying that kilogram, as well as the remaining cocaine. Detective WOODALL gave the remaining 2 kilograms of cocaine to Officer Benson to give to Officer Matich. Officer Matich delivered a total of 3 kilograms of cocaine to his associate. Detective WOODALL decided to keep the partial kilogram of cocaine for himself. Subsequently, Detective WOODALL received from Officer Benson his share of the proceeds of the sale of the 3 kilograms of cocaine by Officer Matich's associates.

7

Detective WOODALL gave 1 kilogram of cocaine to Fred Rock, so that Rock could sell the cocaine for Detective WOODALL. Subsequently, Rock gave Detective WOODALL a total of approximately $9,500, which was the proceeds of Rock's sale of the cocaine. Rock still owes Detective WOODALL money from the sale of this kilogram of cocaine. Detective WOODALL contacted Miedzianowski to make sure that Rock was not cooperating with federal agents.

After Person B's arrest, Detective WOODALL learned that a number of police officers assigned to the 25th District were discussing a search of a car in a police impound lot. Supervisors asked Detective WOODALL about a trip to the police impound lot. On a number of occasions, Detective WOODALL, Officers Matich and Benson and other police officers who participated in the arrest of Person B met, discussed what they should say if asked about the arrest of Person B, and agreed that they would falsely say that the arrest of Person B occurred as described in the police reports.

6. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a) Because the quantity of narcotics involved was more than six kilograms, but less than seven kilograms of cocaine powder, the base offense level is 32, pursuant to Sentencing Guideline Section 2D1.1(a)(3) and (c)(4);

(b) Because defendant WOODALL, Matich and Benson possessed dangerous weapons, namely, firearms, during the commission of the offense, the offense level is increased by 2, pursuant to Sentencing Guideline Section 2D1.1(b);

8

(c) Because defendant WOODALL abused a position of public trust, namely, his position as a Chicago Police Officer, in a manner that significantly facilitated the commission and concealment of the offense, the offense level is increased by 2, pursuant to Sentencing Guideline Section 3B1.3;

(d) Defendant WOODALL has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Sentencing Guideline Section 3E1.1, a two-level reduction in the offense level is appropriate;

(e) Defendant WOODALL timely notified the government of his intention to enter a plea of guilty, and timely provided complete information to the government concerning his own involvement in the offense, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, within the meaning of Sentencing Guideline Section 3E1.1(b); an additional one-point reduction in the offense level is therefore appropriate, provided the court determines the offense level to be 16 or greater prior to the operation of Sentencing Guideline Section 3E1.1(a);

(f) Based upon the facts known to the government, the defendant's criminal history points equal 0, and defendant's criminal history category is I;

(g) The offense level total is 33 and, therefore, the applicable guideline range is 135 to 168 months of imprisonment and the applicable fine range is $17,500 to 175,000;

(h) The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Plea Agreement. The defendant understands that the Probation Department will conduct its own

9

investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Plea Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations; and

(i) Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Plea Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

7. Defendant understands that the charge in the superseding information carries a maximum penalty of life imprisonment, a mandatory minimum penalty of 10 years of imprisonment and a fine of $4,000,000, as well as a term of supervised release of at least 5 years.

8. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on the charge to which he has pleaded guilty, in addition to any other penalty imposed. The defendant understands that the government will request that the Court order that the defendant pay the special assessment of $100 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

10

9. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charge against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury;

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt;

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt;

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court;

11

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf; and

(f) Defendant understands that he has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that he has been prosecuted by way of information.

10. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal a sentence. In exchange for the concessions made by the government in this plea agreement, defendant knowingly waives the right to appeal any sentence imposed consistent with paragraph 13, below, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatever. The defendant also waives his right to challenge the sentence in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255, except as to issues of ineffective assistance of counsel in the negotiation of this waiver.

11. Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-

12

trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the Northern District of Illinois may request defendant's cooperation pursuant to this Plea Agreement. Defendant further agrees to postpone his sentencing until after the conclusion of the prosecution of his codefendants.

12. Defendant understands that the United States Attorney's Office will fully apprize the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation, and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline § 5K1.1 and Title 18, United States Code, § 3553(e), to depart from the applicable sentencing guidelines range and statutory mandatory minimum, and to impose a sentence which does not exceed the maximum term of incarceration agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons which does not exceed one hundred twenty (120) months. The government shall recommend that the Court impose a sentence which includes a term of imprisonment in the custody of the Bureau of Prisons for eighty percent (80%) of the low end of the applicable guidelines range. Other than the agreed maximum term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a

13

sentence which does not exceed the agreed maximum term of incarceration set forth, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d), and neither party may move for a departure from the applicable guidelines range. If, however, the Court refuses to impose a sentence which does not exceed the agreed maximum term of incarceration set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

14. Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement. He further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Plea Agreement. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

15. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement, to cause defendant to plead guilty.

16. Defendant understands that this Plea Agreement is a matter of public record and may be disclosed to any party.

14

17. At defendant's sentencing, the government will dismiss the charge in the indictment as to the defendant.

18. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Plea Agreement.

AGREED THIS DATE: _12-11-03_

PATRICK J. FITZGERALD
United States Attorney

BRIAN P. NETOLS
Assistant United States Attorney

JOHN R. LAUSCH
Assistant United States Attorney

JON F. WOODALL
Defendant

ALAN R. BRUNELL
Attorney for Defendant

15